1
2
3
4
5
6
7

**FILED**
CLERK, U.S. DISTRICT COURT

04/29/16

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ GR _____ DEPUTY

8
9
10

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

11
12
13
14
15
16
17

SHARON I. THOMAS,

         Plaintiff,

   v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

         Defendant.

Case No.  CV 15-01451-RAO

**MEMORANDUM OPINION AND ORDER**

18

## I.    **INTRODUCTION**

19
20
21

     Plaintiff Sharon I. Thomas ("Plaintiff") challenges the Commissioner's denial of her application for a period of disability and disability insurance benefits ("DIB").  For the reasons below, the decision of the Commissioner is AFFIRMED.

22

## II.   **PROCEEDINGS BELOW**

23
24
25
26
27

     On May 31, 2012, Plaintiff protectively filed an application for DIB alleging disability beginning August 15, 2011.  (Administrative Record ("AR") 14, 187-95).  Her application was denied initially on August 29, 2012, and upon reconsideration on March 15, 2013.  (AR 14, 59-85.)  On May 14, 2013, Plaintiff filed a written request for hearing, which was held on October 18, 2013.  (AR 14, 32-58, 97-106.)

28

Represented by counsel, Plaintiff appeared and testified at the hearing.  (AR 14, 32-50.)  An impartial vocational expert also appeared and testified at the hearing.  (AR 14, 50-56.)

On January 2, 2014, the Administrative Law Judge ("ALJ") concluded that Plaintiff had not been under a disability, as defined in the Social Security Act (the "Act"),[1] since August 15, 2011, her alleged onset date ("AOD").  (AR 26-27.)  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review.  (AR 1-7.)  On July 21, 2015, Plaintiff filed a complaint challenging the Commissioner's final decision.  (Dkt. No. 1.)

The ALJ followed a five-step sequential evaluation process to assess whether Plaintiff was disabled under the Act.  *Lester v. Chater*, 81 F.3d 821, 828 n.5 (9th Cir. 1995).  At **step one**, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since her AOD.  (AR 16.)  At **step two**, the ALJ found that Plaintiff had the following severe impairments: hypertension; lumbago with sciatica; obesity; right lower extremity neuropathy and right knee type II change of the medial meniscus; degenerative disc disease of the lumbar spine with radiculopathy; uterine fibroid; depression; and anxiety.  (*Id.*)  At **step three**, the ALJ found that Plaintiff did not have an impairment or combination of impairments "that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  (*Id.*)

Before proceeding to step four, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to:

> [P]erform light work … except she can stand and walk no more than 6 out of 8 hours, but no more than 10 to 15 minutes at a time; would likely need an assistive device for longer periods of walking or

---

[1] Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment expected to result in death, or which has lasted or is expected to last for a continuous period of at least 12 months.  42 U.S.C. § 423(d)(1)(A).

standing; can sit for 6 hours out of 8 with brief position changes after approximately 30 to 45 minutes; can occasionally stoop, bend, climb steps, or balance; rarely crawl, squat, kneel, or crouch; cannot climb ladders, ropes or scaffolds; cannot do work at unprotected heights, around moving machinery or other hazards; cannot do jobs that require hypervigilance or intense concentration on a particular task[, for example, jobs where the claimant cannot be off-task for even the briefest amount of time, such as in watching a surveillance monitor, or where safety might be an issue]; cannot do repetitive or constant push or pull with right lower extremity; can have occasional, non-intense interaction with the general public; and is limited to unskilled work.

(AR 17 (footnote incorporated into body of text as bracketed).)

At **step four**, the ALJ found that Plaintiff could not perform any past relevant work.  (AR 25.)  At **step five**, however, considering Plaintiff's age, education, work experience, RFC, and the vocational expert's testimony, the ALJ found that there are jobs existing in significant numbers in the national economy that Plaintiff could perform, and therefore determined that Plaintiff was not disabled.  (AR 25-27.)

## III.   STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  A court must affirm an ALJ's findings of fact if they are supported by substantial evidence, and if the proper legal standards were applied. *Mayes v. Massanari*, 276 F.3d 453, 458-59 (9th Cir. 2001).  "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue,* 504 F.3d 1028, 1035 (9th Cir. 2007) (citing *Robbins v. Soc. Sec. Admin.,* 466 F.3d 880, 882 (9th Cir. 2006)).  An ALJ can satisfy the substantial evidence requirement "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (citation omitted).

"[T]he Commissioner's decision cannot be affirmed simply by isolating a specific quantum of supporting evidence.  Rather, a court must consider the record

as a whole, weighing both evidence that supports and evidence that detracts from the Secretary's conclusion." *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001) (citations and internal quotations omitted). "'Where evidence is susceptible to more than one rational interpretation,' the ALJ's decision should be upheld." *Ryan v. Comm'r of Soc. Sec.,* 528 F.3d 1194, 1198 (9th Cir. 2008) (citing *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005)); *see also Robbins,* 466 F.3d at 882 ("If the evidence can support either affirming or reversing the ALJ's conclusion, we may not substitute our judgment for that of the ALJ."). The Court may review only "the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (citing *Connett v. Barnhart,* 340 F.3d 871, 874 (9th Cir. 2003)).

## IV.   DISCUSSION

Plaintiff contends that the "ALJ failed to properly evaluate [her] excess pain testimony and nonexertional limitations." (Memorandum in Support of Plaintiff's Complaint ("Pl. Memo.") at 4-14.) The Commissioner contends, in turn, that the "ALJ properly evaluated Plaintiff's subjective complaints of pain and functional limitations." (Defendant's Memorandum in Support of Defendant's Answer ("Def. Memo.") at 2-9.) For the reasons stated below, the Court concludes that the ALJ's credibility determination must be upheld.

### A.   Plaintiff's Hearing Testimony

Plaintiff testified that she was born in 1964; was 49 years old on the hearing date; and held a bachelor's degree in criminal justice. (AR 39.) Plaintiff testified that she was unemployed, and was last employed as an accounts receivable supervisor at a window company in September 2009. (AR 39-40.) She lost that job when the company closed. (AR 40.) When asked if she thought she still would be working there had the company not closed, Plaintiff said, "I wish I could. I would if I was healthy, but I spend most of my day in the bed; so I probably wouldn't be working." (*Id*.)

4

Plaintiff testified that after the window company closed, she looked for other work and took a paralegal course, but then she "started getting ill." (*Id.*) The ALJ asked Plaintiff if there was a specific event that prompted the degeneration of her condition, and in response, she stated that "all of the sudden, [her] back just started bothering [her] one day." (*Id.*) Plaintiff testified that she thought she had a urinary tract infection and went to her doctor, who gave her medicine to treat the presumed infection. (*Id.*) Plaintiff's back began to hurt again one week later, however, and consistently hurt thereafter. (AR 41.)

Plaintiff testified that she stood five feet and four inches tall and weighed 215 pounds, and told the ALJ that she took one medication to treat her hypertension and took prescription Motrin and naproxen on occasion for her pain symptoms. (*Id.*) She did not take any medication for depression or anxiety, and testified that she was "kind of paranoid about medication" due to a past incident where she had a "really bad reaction" to an antibiotic. (AR 41-42.)

Plaintiff brought a cane to the hearing, and testified that she had been using it since November 2012 after an urgent care doctor suggested that she use an assistive device to avoid "ruptur[ing] the tendon" in her right knee. (*Id.*) Plaintiff testified that she now used the cane all the time, even at home, because she "lost strength in her knee." (AR 42-43.) Plaintiff further testified that she does not drive often, and only does so when she has to. (AR 43.)

Regarding pain, Plaintiff testified that her daily pain rates as a seven or eight out of a 10-point scale with or without medication because "[t]he medication rarely helps." (*Id.*) As between her knee and back, Plaintiff testified that her "back is the one that gives [her] the most problem." (*Id.*) The ALJ asked whether surgery had been recommended, and in response, Plaintiff stated: "Actually, I have a schedule -- another scheduled MRI for November 1st. So I really -- at this point, I just don't know. I don't know." (*Id.*) Plaintiff testified that she learned upon reading records that she had scoliosis and was told that she "had a bulging disc and arthritis[,]" but

was not sure what was wrong with her back.  (AR 43-44.)  According to Plaintiff, a physical therapist had given her stretches to do at home—which she did.  (AR 44.)

Plaintiff testified that she could sit for five minutes at a time before having to get up and move around, stand for around the same time before having to sit down, and walked very little, "even though the physical therapist … suggested it[.]"  (AR 44.)  The ALJ asked Plaintiff if she thought she could do any type of work, like, for example, an occupation "where [she] could sit and stand as [she] needed to and it wasn't stressful and it was indoors."  (AR 45.)  In response, Plaintiff said, "[w]ell, I spend most of my day laying because my back bothers me that much."  (*Id.*)

Plaintiff testified that she lives with her parents, is not married, and has two sons who, as of the hearing date, were 21 and 19.  (AR 45.)  Plaintiff testified that she does not clean or do many chores[,]"  and "cook[s] a little but not much."  (*Id.*)  She testified that her "72-year-old mother does most of [her] stuff for [her]."  (*Id.*)

Prompted to describe her mental health status, Plaintiff stated that she was "numb to it all" and she cries for no reason "because [she is] just so overwhelmed."  (AR 45-46.)  Plaintiff testified that she suffers from anxiety and panic attacks, had been "sad" for a long time, and did not "have any feelings" anymore.  (AR 46.)

Plaintiff testified that her primary hobby is reading, and that pain prevents her from doing many other things.  (*Id.*)  Specifically, Plaintiff said: "I don't go, really, a lot of places because it's uncomfortable for me to sit for any amount of time.  So I spend most of my time at home laying on my couch.  [¶]  … Just the ride over here -- and I live probably 12 minutes away -- is uncomfortable for me."  (*Id.*)

Upon questioning from her attorney, Plaintiff stated that she had not received treatment for her depression in several months because she "lost [her] Medi-Cal[,]" and was not sure whether such coverage would be available under her remaining insurance—Riverside Healthcare.  (AR 48.)  Plaintiff further stated that when she shops for groceries, she usually goes with her mother and uses the motorized carts in the store.  (*Id.*)  Finally, Plaintiff stated that she selected August 15, 2011, as her

AOD because it was the "original date when [she] went to the emergency room with … back pain, … [which she] thought … was a urinary tract infection." (AR 49.)

### B.   Applicable Legal Standards

"In assessing the credibility of a claimant's testimony regarding subjective pain or the intensity of symptoms, the ALJ engages in a two-step analysis." *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (citing *Vasquez v. Astrue*, 572, F.3d 586, 591 (9th Cir. 2009)). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1102 (2014) (quoting *Lingenfelter*, 504 F.3d at 1036) (internal quotation marks omitted). If so, and if the ALJ does not find evidence of malingering, the ALJ must provide specific, clear and convincing reasons for rejecting a claimant's testimony regarding the severity of her symptoms. *Id*. The ALJ must identify what testimony was found not credible and explain what evidence undermines that testimony. *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001). "General findings are insufficient." *Lester,* 81 F.3d at 834.

### C.   Discussion[2]

After consideration of the evidence, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause [her] alleged symptoms;" but found that her "statements concerning the intensity, persistence,

---

[2] Aside from a number of passing references to her mental impairments, Plaintiff's memorandum focuses almost exclusively on the ALJ's analysis of her physical impairments and limitations. (*See generally* Pl. Memo. at 1-14.) Because Plaintiff does not address the ALJ's analysis of her depression and anxiety, that analysis is not addressed herein. *See Indep. Towers of Wash. v. Washington,* 350 F.3d 925, 929 (9th Cir. 2003) (declining to consider claims not argued in appellant's opening brief); *see also Hasting v. Comm'r of Soc. Sec.*, 581 F. App'x 694, 695 (9th Cir. 2014) ("We decline to consider additional issues unsupported by argument in the opening brief.") (citing *Indep. Towers of Wash.,* 350 F.3d at 929).

7

and limiting effects of [those] symptoms [were] not entirely credible." (AR 20.) In reviewing the ALJ's hearing decision, the Court has identified a number of grounds on which the ALJ discounted Plaintiff's credibility. Specifically, the ALJ found that: (1) Plaintiff stopped working because she was laid off, not because of her alleged disabilities; (2) for a period of time after claiming disability, Plaintiff received unemployment benefits, suggesting that she still entertained the possibility of working; (3) Plaintiff's daily activities were not as limited as one would expect given her allegations of disabling pain; (4) Plaintiff's allegations were incompatible with the objective medical evidence; (5) Plaintiff received only routine, conservative treatment; and (6) no medical opinion supports Plaintiff's allegations of disabling pain. (*See* AR 18-24.) Because the ALJ did not accuse Plaintiff of malingering, the ALJ's reasons for each ground must be clear and convincing.

### 1.    *Reason for Cessation of Work*

The ALJ noted that Plaintiff testified that she stopped working because of "a business-related layoff rather than because of the allegedly disabling impairments." (AR 19.) And in support of the ALJ's finding, the Commissioner directs the Court to *Bruton v. Massanari*, 268 F.3d 824 (9th Cir. 2001). (*See* Def. Memo. at 4.)

In *Bruton*, the Ninth Circuit upheld an ALJ's negative credibility finding, in part, because the claimant "stated at the administrative hearing and to at least one of his doctors that he left his job because he was laid off," not because he was injured. *Id*. at 828. However, the facts of *Bruton* differ from the facts here. In *Bruton*, the claimant was injured on the job in March 1993, continued working until he was laid off on April 6, 1993, and then applied for DIB on June 10, 1993, alleging disability as of April 6, 1993. *Id*. at 826. The claimant did not seek medical attention for his work-related injury until September 1993. *Id*. Here, Plaintiff's employer closed in September 2009. Almost 33 months later—on May 31, 2012—Plaintiff filed a DIB application alleging disability as of August 15, 2011, nearly two years after she was laid off. The gap between Plaintiff's last date of employment and her AOD lessens

1    the impact of her admission that she originally stopped working for non-disability
2    reasons. *See Shehan v. Astrue*, 2009 WL 2524573, at *3 (C.D. Cal. Aug. 17, 2009)
3    (finding that plaintiff's non-disability "reasons for leaving her earlier jobs was not a
4    proper basis for rejecting her credibility[,]" in part, because those "jobs ended long
5    before her alleged onset date of August 2005").

6          The Court has reviewed the Commissioner's arguments supporting the ALJ's
7    determination, but, on balance, finds that this reason for discounting the credibility
8    of Plaintiff's testimony is not clear and convincing.

9                    **2.    *Unemployment Benefits***

10         The ALJ further noted that Plaintiff "received unemployment compensation
11   during the relevant period at issue[,]" and that "[r]eceiving unemployment in the
12   State of California requires the claimant to certify she is willing and able to engage
13   in work activity, which is not entirely consistent with a claim for disability."  (AR
14   19.)  The receipt of unemployment benefits is a reason to discount the credibility of
15   a claimant *only if* she holds herself out as available for full-time work.  *Carmickle v.*
16   *Comm'r, Soc. Sec. Admin.,* 533 F.3d 1155, 1162 (9th Cir. 2008).  If the record "does
17   not establish whether [a claimant] held himself out as available for full-time or part-
18   time work," the use of unemployment benefits as a basis for a "credibility finding is
19   not supported by substantial evidence."  *Id*.  Here, the record shows that Plaintiff
20   received unemployment benefits during the fourth quarter of 2011, and also the first
21   quarter of 2012.  (AR 212-13.)  It is unclear, however, whether she held herself out
22   as available for full-time or part-time work.  Thus, the Court finds that this reason
23   for discounting Plaintiff's credibility is not supported by substantial evidence.

24                    **3.    *Daily Activities***

25         The ALJ also noted "that despite her impairments, [Plaintiff] has engaged in
26   a somewhat normal level of daily activity and interaction." (AR 19.)  Specifically,
27   the ALJ noted that:
28   / / /

9

1
2
3
4
5

[Plaintiff] indicated that she goes outside four to five times a week; she can drive, go shopping once a week, make small meals for herself and her sons, do some chores such as the laundry and dishes, and make the bed.  She revealed that she reads and writes on a daily basis, she can follow instructions well, she has no problems paying attention, she finishes what she starts, she gets along with authority figures, and she can handle changes in routine.

6

(*Id.*)

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Inconsistencies between symptom allegations and daily activities may act as a clear and convincing reason to discount a claimant's credibility, *see Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008); *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991), but a claimant need not be utterly incapacitated to obtain benefits. *Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir. 1989).  The fact that Plaintiff carried on daily activities such as shopping and driving, and ventured outside of her home on a somewhat regular basis does not detract from her overall credibility.  *See Vertigan v. Halter,* 260 F.3d 1044, 1050 (9th Cir. 2001).  Further, the mere ability to perform some chores and to prepare small meals is not necessarily indicative of an ability to perform work activities because "many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication."  *Fair*, 885 F.2d at 603; *see also. Molina*, 674 F.3d at 1112-13 (the ALJ may discredit a claimant who "participat[es] in everyday activities indicating capacities that are transferable to a work setting"). The critical difference between such activities "and activities in a full-time job are that a person has more flexibility in scheduling the former . . . , can get help from other persons . . ., and is not held to a minimum standard of performance, as she would be by an employer."  *Bjornson v. Astrue,* 671 F.3d 640, 647 (7th Cir. 2012) (cited with approval in *Garrison v. Colvin,* 759 F.3d 995, 1016 (9th Cir. 2014).

26
27

Thus, the Court finds that this reason for discounting Plaintiff's credibility is not a clear and convincing reason that is supported by substantial evidence.

28

/ / /

10

### 4.     *Objective Evidence*

The ALJ found that the credibility of Plaintiff's allegations about the severity of her symptoms and limitations were diminished because they were "incompatible with that reasonably expected in light of the objective . . . evidence of record."  (AR 18-19.)  Specifically, the ALJ found after reviewing the record that:

> The medical signs and findings do not substantiate the existence of the extreme limitations the claimant has alleged.  While … the claimant's medically determinable impairment could reasonably be expected to cause some pain, the mere existence of pain, even chronically, does not require a finding that an individual cannot work and the fact that working may cause pain and discomfort does not mandate a finding of disability.   The positive objective clinical and diagnostic findings since the alleged onset date detailed below do not support more restrictive functional limitations than those assessed herein.

(AR 20.)

The lack of supporting objective medical evidence cannot form the sole basis for discounting testimony, but it is a factor that the ALJ may consider in making a credibility determination.  *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005).

Plaintiff identifies evidence that she believes contradicts the ALJ's findings regarding the objective evidence.  (*See* Pl. Memo. at 9-13.)  In particular, Plaintiff relies on physical therapy treatment notes and reports in the record.  (*See, e.g., id*. at 10 (discussing findings of an initial physical therapy evaluation and noting that they were "consistent with her testimony that she can sit and stand for very short periods and has little mobility"), 11 (summarizing the findings of a 2012 physical therapy discharge report and two physical therapy sessions from 2013), 12 ("The physical therapy was not effective and notes little improvement in pain or mobility."), 13 ("The physical therapy record shows difficulty with mobility consistent with the limited daily activities to which Ms. Thomas testified.").)  The ALJ acknowledged that Plaintiff had been referred to and had not "progress[ed] very well with physical

therapy." (AR 21-22.) And certain notations in the physical therapy records indeed lend some support to Plaintiff's assertions. (*See, e.g.,* AR 411-12 (discharge report noting, *inter alia*, that Plaintiff could sit for five minutes without symptoms and had significant lumbar pain and flexibility issues). However, other substantial evidence appears to corroborate the ALJ's finding that the objective evidence did not support the extreme impairments and limitations that Plaintiff testified that she had.

For example, in April 2012—eight months *after* Plaintiff's AOD—an x-ray of Plaintiff's lumbar spine revealed only mild spondylosis, and on April 30, 2012, a physical examination noted some tenderness over Plaintiff's lumbar spine but good range of motion. (AR 406, 559.) There were more significant findings in a June 4, 2012, physical assessment which noted, *inter alia*, that Plaintiff was walking with a limp, and had sciatica and a Vitamin D deficiency. (AR 405.) However, Plaintiff's range of motion was again noted as "okay"; the treatment plan summary consisted of relatively conservative measures, such as physical therapy, an MRI, and Motrin; and the treating clinician declined Plaintiff's request to complete disability forms at that time. (*Id.*) MRI results later that month showed moderate disc desiccation and disc space narrowing, mild to moderate right and moderate left neural foraminal narrowing, and disc (L5-S1) protrusion measuring a maximum of 4 to 5 millimeters in diameter, but the rest of the findings were normal or mild. (AR 562.) On August 28, 2012, an orthopedic spine specialist evaluated Plaintiff and noted that while she had difficulty changing positions from sitting to standing, her gait was only mildly antalgic, her motor strength was normal or nearly normal, and her straight leg raise was mildly positive in the right lower extremity only, and negative in the left lower extremity. (AR 600.) The spine specialist summarized the pertinent findings of the diagnostic studies mentioned above, assessed Plaintiff as having degenerative disc disease and disc bulge with foraminal stenosis, and referred her to physical therapy. (*Id.*) A September 26, 2012, physical assessment states that Plaintiff was informed that the spine specialist determined that Plaintiff was not disabled. (*See* AR 400.)

12

The objective evidence regarding Plaintiff's right knee problems is even less indicative of an impairment that is as severe as Plaintiff alleged.  On a January 24, 2013, Patient History Intake Form, Plaintiff reported that her right knee pain began in October 2012, and that she began using a cane after it was suggested by a doctor during a November 2012 visit to urgent care.  (AR 571; *see also* AR 42-43 (hearing testimony regarding cane and knee problems), 471 (Urgent Care Patient Encounter Form dated November 20, 2012).)  However, an x-ray image of her right knee taken on December 11, 2012, found that "[t]he joints [were] normal without narrowing, articular irregularity, or spurring … [and t]he soft tissues [were] well-maintained," and concluded that Plaintiff's right knee was normal.  (AR 558.)  A February 20, 2013, MRI showed Type II signal changes of the medial meniscus with no evidence of tearing, and otherwise normal findings.  (AR 560.)  Plaintiff complained of right knee swelling and constant stabbing pain rating as a 9 on a 1 to 10 scale at a March 7, 2013, orthopedic examination.  (AR 576.)  But while the physician's examination indeed revealed some swelling and tenderness, the objective findings do not appear to validate Plaintiff's subjective reports of pain.  (*See* AR 577.)  After reviewing the February 2013 MRI, the physician diagnosed sciatic-like symptoms, neuropathy, and "type II change medial meniscus."  (*Id.*)  Plaintiff was referred for an electromyogram and nerve conduction study and told to return after testing.  (*Id.*)

In sum, the objective evidence in the record does not suggest Plaintiff had no impairments or limitations.  Nor did the ALJ suggest that was the case.[3]  Rather, the ALJ found that "[t]he medical signs do not substantiate the existence of the extreme limitations the claimant has alleged," and thus concluded that Plaintiff's statements

/ / /

---

[3] Indeed, as is discussed *infra*, the ALJ disagreed with the state agency physicians' determination that Plaintiff could perform a reduced range of medium work, finding that they underestimated Plaintiff's limitations in light of the objective evidence and her subjective complaints.  (AR 24, 63-65, 79-81.)  Instead, the ALJ concluded that Plaintiff could perform a reduced range of light work.  (AR 17.)

1   were "not entirely credible."  (AR 20.)  In light of the objective evidence discussed,

2   the Court finds that the ALJ's determination is supported by substantial evidence.

3               **5.    *Routine and Conservative Treatment***

4           Furthermore, the ALJ noted that Plaintiff "ha[d] only been prescribed routine

5   and conservative treatment[.]"  (AR 19.)  Specifically, Plaintiff's treatment:

6   > [C]onsist[ed] of physical therapy and medications as well as weight
7   > loss for her symptoms.  Epidural injections were recommended for her
8   > back pain in November 2012.  However, there is no suggestion of
9   > other more aggressive or alternative treatment modalities such as
10  > surgery, referral to a pain clinic, biofeedback, a TENs unit, or
11  > acupuncture.  The lack of more aggressive treatment or surgical
    > intervention suggests the claimant's symptoms and limitations were
    > not as severe as she alleged.

12  (*Id.* (citations to the record omitted).)

13          This is a permissible reason to discount a claimant's credibility.  *See Parra v.*

14  *Astrue,* 481 F.3d 742, 750-51 (9th Cir. 2007); *Meanel v. Apfel,* 172 F.3d 1111, 1114

15  (9th Cir. 1999) (plaintiff's claim "that she experienced pain approaching the highest

16  level imaginable" rejected as inconsistent with the minimal, conservative treatment

17  she received).  Plaintiff objects to the ALJ's determination, however, arguing that:

18  > Ms. Thomas was referred to pain clinic for steroid injections
19  > December 21, 2012.  In *Yang v. Barnhart*, No. ED CV 04-958-PJW,
20  > 2006 WL 3694857, at *4 (C.D. Cal. Dec. 12, 2006) the Court found
    > that conservative treatment with physical therapy, injections, and pain
21  > medications without the suggestion that more radical treatment would
22  > be appropriate is not sufficient basis to reject a treating opinion much
    > less the severity of one's complaint.  Ms. Thomas underwent the
23  > therapy prescribed to her and was in the process of obtaining pain
24  > management.  The ALJ's rationale is without merit.

25  (Pl. Memo. at 9 (citations omitted).)

26          As an initial matter, the Court notes that *Yang* addressed a different question;

27  that is, whether a treating doctor's conservative treatment of his patient constituted

28  a specific and legitimate reason to reject his opinion.  *Yang*, 2006 WL 3694857, at

*4.  In *Yang*, the court found that even if the reason was specific and legitimate, the ALJ's finding was "not supported by substantial evidence in th[e] record[,]" which showed that the plaintiff was treated with "several potent drugs," physical therapy, epidural injections, and "surgery on his neck to eliminate swollen glands, though they may not have been related to his back pain." *Id*.

Here, by contrast, while it is clear that Plaintiff received physical therapy as a mode of treatment (*see* AR 411-70), it is unclear whether any other factors deemed salient in *Yang* are present.  For example, Plaintiff testified that she only takes prescription Motrin and naproxen for pain.  *Cusimano v. Astrue*, 2013 WL 178148, at *16 (N.D. Cal. Jan. 16, 2013) ("Plaintiff … received conservative pain treatment, … [including] prescriptions for Tylenol, Motrin, acetaminophen, and ibuprofen.").  And while a few notations in the record suggest that more aggressive treatment was considered (*see, e.g.*, AR 597 (record signed by orthopedic surgeon on December 7, 2012, stating Plaintiff "will be referred for a course of lumbar epidural injections"), 737 (Physical Therapy Lumbar Spine Evaluation dated August 12, 2013: "PCP to consider referral to neurology/neurosurg. pt. encouraged to get medical records")), Plaintiff has not identified—nor has the Court located—any records suggesting that more aggressive treatments were actually prescribed or undertaken.  (*See* Pl. Memo. at 9.  *Cf. Calvert v. Colvin*, 2014 WL 4415989, at *4 (E.D. Wash. Sept. 8, 2014) ("Only conservative treatment has been recommended.  There is no record Calvert went to physical therapy, tried prescription medication stronger than ibuprofen or underwent epidural steroid injections.").)  As noted above, Plaintiff stated at the hearing that she did not know whether surgery had been recommended for her back, and did not know what doctors were telling her regarding her back.  (AR 43-44.)

Thus, on the record presented, the Court finds that this reason for discounting the credibility of Plaintiff's testimony is a clear and convincing reason that is supported by substantial evidence in the record.

/ / /

### 6. *Lack of Supporting Medical Opinions*

Finally, the ALJ noted that "a review of the record . . . reveals no restrictions recommended by any doctor, including a treating orthopedic specialist."  (AR 24.)  "The ALJ may consider whether the medical opinions support plaintiff's subjective claims in making a credibility determination."  *See Hernandez v. Astrue*, 2010 WL 1498988, at *4 (C.D. Cal. Apr. 12, 2010) (citing *Burch*, 400 F.3d at 680).

Here, the only formal opinions in the record appear to be the opinions of the State agency consultants "who opined at the initial and reconsideration levels that [Plaintiff] is able to perform a reduced range of *medium exertional capacity*."  (AR 24 (emphasis added); AR 63-65, 79-81.)   The ALJ found that those opinions *underestimated* Plaintiff's limitations in light of the objective evidence in the record and her subjective complaints, and thus accorded them little weight, instead finding that Plaintiff could only perform a reduced range of *light* work.  (AR 17, 24.)

The ALJ also mentioned a notation in the record dated September 26, 2012, in which a treating clinician noted that a spine specialist stated that Plaintiff had no disability, and noted further that Plaintiff had been advised as such and encouraged to discuss her disability status with the specialist.  (AR 24, 400.)  The ALJ properly declined to give the spine specialist's opinion controlling or significant weight, as it is "the Commissioner's statutory responsibility to determine whether an individual is disabled[,]" but permissibly accorded "some weight" to the specialist's opinion because:

> [O]pinions from any medical source on issues reserved to the Commissioner must never be ignored.  The adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner.

Social Security Ruling ("SSR") 96-5p, 1996 WL 374183, at *3 (July 2, 1996); *see Bray v. Comm'r Soc. Sec. Admin.,* 554 F.3d 1219, 1224-25 (9th Cir. 2009) (SSRs

16

are not binding on a district court, but they are entitled to some deference if they are consistent with the Social Security Act and the regulations).

Thus, on the record presented, the Court finds that this reason for discounting the credibility of Plaintiff's testimony is a clear and convincing reason that is supported by substantial evidence.

In sum, the Court notes that the ALJ did not determine that Plaintiff had no limitations. Rather, the ALJ determined that the evidence in the record did not fully support Plaintiff's statements regarding the severity of her impairments and limitations. The ALJ's interpretation might not be the only reasonable one, but if it is supported by substantial evidence, this Court cannot engage in second-guessing. *Rollins v. Massanari,* 261 F.3d 853, 857 (9th Cir. 2001). For the reasons above, the Court finds that the ALJ's credibility determination was based on at least three clear and convincing reasons that are supported by substantial evidence—and thus finds that there is no material legal error present that necessitates reversal and/or remand.

## V.   **CONCLUSION**

IT IS ORDERED that Judgment shall be entered AFFIRMING the decision of the Commissioner denying benefits.

IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this Order and the Judgment on counsel for both parties.

DATED:  April 29, 2016

_____
ROZELLA A. OLIVER
UNITED STATES MAGISTRATE JUDGE

### NOTICE

**THIS DECISION IS NOT INTENDED FOR PUBLICATION IN WESTLAW, LEXIS/NEXIS, OR ANY OTHER LEGAL DATABASE.**